**NOT YET SCHEDULED FOR ORAL ARGUMENT**

*In the*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 ℭ𝔬𝔩𝔲𝔪𝔟𝔦𝔞 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

Case No. 14-1079

GORDON BRENT PIERCE,

*Petitioner*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*

ON PETITION FOR REVIEW FROM SECURITIES
AND EXCHANGE COMMISSION IN NO. SEC-3-13927

## BRIEF OF PETITIONER

Juan Marcel Marcelino
juan.marcelino@nelsonmullins.com
Madeleine M. Blake
madeleine.blake@nelsonmullins.com
NELSON MULLINS RILEY &
  SCARBOROUGH, LLP
One Post Office Square
Boston, MA 02109-2127
Telephone: (617) 573-4700
*Attorneys for Petitioner*

Christopher B. Wells
wellsc@lanepowell.com
David C. Spellman
spellmand@lanepowell.com
LANE POWELL PC
1420 Fifth Avenue, Suite 4200
Seattle, Washington 98101-2338
Telephone: (206) 223-7000
*Attorneys for Petitioner*

October 23, 2014

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. Rule 28(a)(1), Petitioner Gordon Brent Pierce ("Pierce") files this Certificate as to Parties, Rulings and Related Cases as follows:

### A.     Parties

The parties to this case are Pierce and the Securities and Exchange Commission (the "Commission" or "SEC").

### B.     Rulings Under Review

Pierce seeks reversal of the rulings and dismissal of the relief in the Opinion of the Commission entered on March 7, 2014 (the "Opinion") (JA 839-74), which authorized the Order Imposing Remedial Sanctions also entered on March 7, 2014 ("Sanctions Order") (JA 875-76) (both under Securities Act of 1933 Release No. 9555 and Securities Exchange Act of 1934 Release No. 71664).   Additionally, Pierce seeks reversal of the SEC's Order Denying Motion for Reconsideration entered on May 15, 2014, in Administrative Proceeding File No. 3-13927.

### C.     Related Cases

There are no pending or related cases of which counsel is aware.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ....................................................................v

GLOSSARY.............................................................................................x

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................2

STATUTES AND RULES ......................................................................3

STATEMENT OF THE CASE................................................................3

A.   The Commission's First and Second Administrative Adjudicatory
     Proceedings Sprang from a Single Investigation.............................3

B.   The Commission's Order Instituting the First Proceeding Alleged
     Wrongdoing by Pierce and His "Associates" and "Offshore
     Companies."....................................................................................3

C.   The Division of Enforcement Contended that Newport and Jenirob
     Were Pierce's "Associates" and "Offshore Companies" Throughout
     the First Proceeding .......................................................................5

D.   During the First Proceeding, the Division Sought Additional
     Disgorgement from Pierce for Trading in Newport and Jenirob
     Accounts Based on New Evidence...................................................6

E.   The ALJ's Initial Decision Admitted the New Evidence But Deferred
     to the Commission to Address Disgorgement from Those Accounts ............8

F.   The Division Did Not Appeal the Initial Decision, and the
     Commission Adopted the Decision as its Final Order ...................9

G.   The Commission Brought a Second Proceeding for the Same
     Disgorgement that Was Relinquished in the First Proceeding.....................10

## TABLE OF CONTENTS

**Page**

H.    Pierce Satisfied the Disgorgement Order in the First Proceeding.................11

SUMMARY OF ARGUMENT .................................................................12

STANDING ...........................................................................................13

ARGUMENT ..........................................................................................13

A.    Standard of Review...................................................................13

B.    The Commission Committed Manifest Error by Misconstruing
      Black-Letter Law Governing the Doctrine of Res Judicata .........14

      1.    The Claims Were Raised, Merged and Extinguished in the First
            Proceeding .......................................................................17

            a.    The operative events preceded the filing of the First
                  Proceeding...............................................................20

            b.    The proofs in the first and second proceeding overlap............23

      2.    The Recognized Exceptions for Relaxing Administrative Res
            Judicata Do Not Apply .....................................................24

            a.    Among agencies, the Commission had exclusive
                  authority ..................................................................25

            b.    No intervening change in the constitutional or statutory
                  law ..........................................................................28

            c.    The Commission was not a pro se party lacking
                  procedural safeguards ..............................................30

C.    The Opinion Erred by Applying the Doctrine of Fraudulent
      Concealment ...............................................................................32

D.    The Opinion Rewards the Division for Not Following the
      Commission's Rules While Punishing Pierce for Following the Rules........38

iii

## TABLE OF CONTENTS

**Page**

E.    The Opinion also Erred by Failing to Rule in Pierce's Favor on
      Additional Affirmative Defenses..................................................................41

      1.    Equitable Estoppel Barred the Second Proceeding............................41

      2.    Judicial Estoppel Barred the Fraudulent Concealment Claim ...........44

      3.    Waiver Barred the Second Proceeding ................................................47

CONCLUSION ........................................................................................................49

ADDENDUM .................................................................................... Add-1

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**FEDERAL CASES**

*Aboudaram v. De Groote*,
  2006 U.S. Dist Lexis 2616 (D.D.C. May 4, 2006) ..............................................50

*American Hoist & Derrick Co. v. Manitowoc Co.*,
  1990 U.S. Dist. LEXIS 18569 (N.D. Ill. Dec. 14, 1990)....................................34

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991)............................................................................................13

*Brown v. Felsen*,
  442 U.S. 127 (1979)............................................................................................12

*Candelario v. Postmaster Gen. of United States*,
  906 F.2d 798 (1st Cir. 1990)...................................................................26, 27, 28

*Carl L. Shipley*,
  45 SEC 589 (1974) .............................................................................................50

*Cartier v. Sec'y of State*,
  506 F.2d 191 (D.C. Cir. 1974).........................................................26, 27, 28, 31

*Chicot Cnty. Drainage Dist. v. Baxter St. Bank*,
  308 U.S. 371 (1940)............................................................................................12

*Costantini* v. *Trans World Airlines*,
  681 F.2d 1199 (9th Cir. 1982) ...........................................................................34

*Dunhaney v. Att'y Gen. of the United States*,
  621 F.3d 340 (3d Cir. 2010) .......................................................................29, 30

*Federated Dep't Stores, Inc. v. Moitie*,
  452 U.S. 394 (1981)......................................................................................13, 25

*Gabelli v. SEC*,
  133 S. Ct. 1216 (2013).................................................................................33, 38

---

* Authorities upon which we chiefly reply are marked with asterisks.

*Graham v. SEC*,
  222 F.3d 994 (D.C. Cir. 2000)...........................................................................14

*Guerrero v. Katzen*,
  774 F.2d 506 (D.C. Cir. 1985)...........................................................................34

*Hardison v. Alexander*,
  655 F.2d 1281 (D.C. Cir. 1981).........................................................................36

*Horning v. SEC*,
  570 F.3d 337 (D.C. Cir. 2009)...........................................................................50

*In the Matter of Russo Securities, Inc.*,
  Exchange Act Release No. 42121 (Nov. 10, 1999)...........................................51

*In re Mathiason v. Halverson*,
  16 F.3d 234 (8th Cir. 1994) ...............................................................................49

*\*L-Tec Elect. Corp. v. Cougar Elect. Org., Inc.*,
  198 F.3d 85 (2d Cir. 1999) ................................................................................34

*\*Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.*,
  750 F.2d 731 (9th Cir. 1984) ................................................................21, 22, 48

*Magnus Elec., Inc. v. La Republica Argentina*,
  830 F.2d 1396 (7th Cir. 1987) ...........................................................................35

*Maldonado v. U.S. Att'y Gen.*,
  664 F.3d 1369 (11th Cir. 2011) ............................................................29, 30, 31

*Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs*,
  726 F.3d 387 (3d Cir. 2013) ..............................................................................29

*Martin v. Donovan*,
  731 F.2d 1415 (9th Cir. 1984) ...........................................................................32

*Matter of Armstrong*,
  201 B.R. 526 (Bankr. D. Neb. 1996)..................................................................49

*Montana v. United States*,
  440 U.S. 147 (1979)...........................................................................................12

*Morgan v. Covington Twp.*,
  648 F.3d 172 (3d Cir. 2011) .............................................................................21

*Moses v. Howard Univ. Hosp.*,
  606 F.3d 789 (D.C. Cir. 2010)....................................................................45, 46

*\*Mpoyo v. Litton Electro-Optical Sys.*,
  430 F.3d 985 (9th Cir. 2005) .....................................................................20, 34

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)..............................................................................45, 46, 47

*Proctor v. LeClaire*,
  715 F.3d 402 (2d Cir. 2013) .............................................................................21

*Purter v. Heckler*,
  771 F.2d 682 (3d Cir. 1985) .............................................................................31

*Rapoport v. SEC*,
  682 F.3d 98 (D.C. Cir. 2012).............................................................................14

*Reynolds v. United States DOJ*,
  2014 U.S. Dist. LEXIS 7234 (D.D.C. Jan. 21, 2014)........................................36

*Rockies Fund, Inc. v. SEC*,
  428 F.3d 1088 (D.C. Cir. 2005)........................................................................14

*San Remo Hotel v. City & Cnty. of S.F., Cal.*,
  545 U.S. 323 (2005)...........................................................................................18

*\*SEC v. Crofters, Inc.*,
  351 F. Supp. 236 (S.D. Ohio 1972), *rev'd on other grounds sub nom*,
  *SEC v. Coffey*, 493 F.2d 1304 (6th Cir. 1974)...................................................38

*\*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ...............................................................16, 17, 21

*\*SEC v. Wyly*,
  950 F. Supp. 2d 547 (S.D.N.Y. 2013) ...............................................................33

*Thompson v. Schweiker*,
  665 F.2d 936 (9th Cir. 1982) .....................................................................31, 32

vii

*United States v. Utah Constr. & Mining Co.*,
  384 U.S. 394 (1966)..................................................................41

## STATUTES, REGULATIONS, AND RULES

5 U.S.C. § 504(a) ......................................................................51

5 U.S.C. § 706(2)(A)..................................................................14

17 C.F.R. § 201.31 .....................................................................51

17 C.F.R. § 201.200(d) ..............................................................49

60 Fed. Reg. 32738, 32757 (June 23, 1995) .............................50

D.C. Cir. Rule 28(a)(5) ...............................................................3

Fed. R. Civ. P. 53 .......................................................................20

Securities Act of 1933, Section 4(1), 15 U.S.C. § 77d .......16, 24

Securities Act of 1933, Section 5, 15 U.S.C. § 77e...................24

Securities Act of 1933, Section 8A(e), 15 U.S.C. § 77h-1 .........3

Securities Exchange Act of 1934, Section 21C(e), 15 U.S.C. § 78u-3 ...................3

## OTHER AUTHORITIES

18 Charles A. Wright et al., *Federal Practice and Procedure* § 4408, at
  188 (2013)..........................................................................14, 18

Restatement (Second) of Judgments, Ch. 1, Introduction (1982) .........14, 23, 41, 42

Restatement (Second) of Judgments, § 24......................15, 17, 22, 23, 24

Restatement (Second) of Judgments, § 26......................... 20, 28, 29, 35, 40, 41, 49

Restatement (Second) of Judgments, § 83......................................25, 26

## HISTORICAL PIERCE/LEXINGTON SOURCES

*Gordon Brent Pierce*,
  Initial Decision, Release No. 425, 2011 SEC LEXIS 2564 (July 27,
  2011). ...............................................................................11

*In re Gordon Brent Pierce*,
    Order Denying Mot. for Recons., Secs. Act of 1933 Release No. 9584;
    Secs. Exch. Act of 1934 Release No. 72174, 2014 SEC LEXIS 1671
    (May 15, 2014), 2014 SEC. LEXIS 839 (Mar. 7, 2014) ...................................11

*In re Gordon Brent Pierce*,
    Order Granting Mot. for Stay, Secs. Act of 1933 Release No. 9598;
    Secs. Exch. Act of 1934 Release No. 72354, 2014 SEC LEXIS 1996
    (June 9, 2014)...........................................................................................11

*In the Matter of Gordon Brent Pierce, Newport Capital Corp., and
    Jenirob Company Ltd.*,
    Admin. Proc. File No. 3 13927 (Securities Act Release No. 9125)
    (June 8, 2010)...........................................................................................10

*In re Matter of Lexington Resources, Inc.*,
    File No. SF 02989 ....................................................................................3

*In the Matter of Lexington Resources, Inc., Grant Atkins, and Gordon
    Brent Pierce*,
    Admin. Proc. File No. 3 13109 (July 31, 2008) ......................................3

*SEC v. Pierce*,
    No. CV 10-80129 (N.D. Cal.)...................................................................12

# GLOSSARY

| Term: | Defined Herein As: |
|---|---|
| ALJ | Administrative Law Judge |
| Commission or SEC | Securities and Exchange Commission |
| Division | SEC Division of Enforcement |
| OIP | Order Instituting Administrative Proceedings |
| Opinion | Opinion of the Commission, Securities Act Proceeding, entered on March 7, 2014 |
| Sanctions Order | Order Imposing Remedial Sanctions, entered on March 7, 2014 |
| Pierce | Petitioner Gordon Brent Pierce |

## JURISDICTIONAL STATEMENT

Pierce timely petitioned for appellate review of the SEC's Opinion (JA 839-74) entered on March 7, 2014, which authorized the Sanctions Order (JA 875-76) also entered on March 7, 2014 (both under Securities Act of 1933 Release No. 9555 and Securities Exchange Act of 1934 Release No. 71664), and the SEC's Order Denying Motion for Reconsideration (JA 877-80) entered on May 15, 2014, in Administrative Proceeding File No. 3-13927.

This Court has jurisdiction under 15 U.S.C. § 77i(a) and 15 U.S.C. § 78y(a)(1).

## STATEMENT OF ISSUES

1.     The Commission reversed the administrative law judge's ("ALJ") ruling that res judicata applied but for the fraudulent concealment exception.  Was the Commission's ruling arbitrary, capricious, an abuse of discretion, or contrary to law?

2.     The Commission affirmed the ALJ's ruling that the fraudulent concealment exception to res judicata applied.  Was the ruling arbitrary, capricious, an abuse of discretion, or contrary to law?

3.     The Commission affirmed the ALJ's ruling that the Commission had not waived a claim for additional disgorgement.  Was the ruling arbitrary, capricious, an abuse of discretion, or contrary to law?

4.     The Commission affirmed the ALJ's ruling that the Commission was not equitably estopped from seeking the additional disgorgement.  Was the ruling arbitrary, capricious, an abuse of discretion, or contrary to law?

5.     The Commission affirmed the ALJ's ruling that judicial estoppel did not bar the Commission from seeking the additional disgorgement.  Was the ruling arbitrary, capricious, an abuse of discretion, or contrary to law?

6.     Should this Court reverse on any other grounds?

## STATUTES AND RULES

The relevant statutory provisions are attached in an Addendum pursuant to

D.C. Cir. Rule 28(a)(5).

## STATEMENT OF THE CASE

**A.    The Commission's First and Second Administrative Adjudicatory Proceedings Sprang from a Single Investigation.**

In 2006, the Commission ordered a private investigation into trading in

Lexington stock.  *In re Matter of Lexington Resources, Inc*., File No. SF 02989;

JA 843 (Opinion at 5); JA 362-65 (Order Directing Private Investigation).  The

investigative order recited the possibility of registration violations by unnamed

"persons or entities" who were consultants, partners and/or affiliates of Lexington

or directly or indirectly the beneficial owners of Lexington common stock.  *Id.*

Those same charges run through both proceedings.

**B.    The Commission's Order Instituting the First Proceeding Alleged Wrongdoing by Pierce and His "Associates" and "Offshore Companies."**

The Commission instituted the First Proceeding, *In the Matter of Lexington*

*Resources, Inc., Grant Atkins, and Gordon Brent Pierce*, Admin. Proc. File No. 3

13109 (July 31, 2008).  JA 844 (Opinion at 6).  The First Proceeding's request for

relief was: "[w]hether Respondent Pierce should be ordered to pay disgorgement

pursuant to Section 8A(e) of the Securities Act and Section 21C(e) of the

Exchange Act."  JA 41 (July 31, 2008 Order Instituting Cease-and-Desist, or "First

3

OIP," Section III.D).  The factual allegations for this broad request against Pierce

included trading by "his associates" and "his offshore company":

- Lexington and Atkins "issued nearly five million shares of Lexington common stock to promoter Gordon Brent Pierce and his associates."[1]

- After receiving Lexington stock registered on Form S-8, Pierce sold "most of his S-8 shares through an offshore company [Newport Capital] that he operated."[2]

- "[A]lmost immediately after receiving the shares, Pierce transferred or sold them through his offshore company."[3]

- "Pierce and his associates deposited about 3 million Lexington shares in accounts at an offshore bank" and "between February and July 2004, about 2.5 million Lexington shares were sold through an omnibus brokerage account in the United States in the name of the offshore bank, generating sales proceeds of over $13 million" of which at least $2.7 million was for sales by Pierce personally through the offshore bank.[4]

---

[1] JA 37 (*id.* at Section II, ¶ 1).
[2] JA 39 (*id.* ¶ 11).
[3] JA 39 (*id.* ¶ 14).
[4] JA 40 (*id.* ¶¶ 15-16).

**C.    The Division of Enforcement Contended that Newport and Jenirob Were Pierce's "Associates" and "Offshore Companies" Throughout the First Proceeding.**

The Division consistently maintained that Newport Capital and Jenirob were among the "associates" and "offshore companies" through which Pierce committed violations of the securities laws.   For example, the Division argued in its pre-hearing brief:

- "Pierce and his companies and cronies reaped millions of dollars in stock sale proceeds."[5]

- "Pierce used Newport Capital to distribute about 2.5 million post-split Lexington shares without registering that distribution."[6]

- "Pierce transferred [2.5 million] shares to Newport Capital.  Newport Capital then sold half of those shares directly to others and placed the other half . . . in brokerage accounts before selling them to investors. Pierce therefore used Newport Capital, as described now, to distribute 2.52 million post-split Lexington shares."[7]

- Newport held nearly one million Lexington shares in its account with Hypo Bank (an offshore bank). Newport sold additional shares to third parties, and those additional shares were also transferred to Hypo

---

[5] JA 370-71 (Division's Pre-Hearing Brief at 1-2).
[6] JA 372 (*id. at* 3).
[7] JA 375 (*id. at* 6).

Bank accounts. In turn, from the Hypo Bank accounts, vFinance sold 1.2 million Lexington shares for an $8.1 million gain.  JA 376 (*id. at* 7); JA 39-40 (First OIP ¶¶ 14-16).

Indeed, the Division's focus on Newport as the "conduit" through which Pierce sold 2.5 million Lexington shares was so complete that its prehearing brief referenced Newport more than 30 times in the factual statement.[8]  The Division's spotlight on Newport continued throughout the three-day hearing during which Newport was referenced 200 times, emphasizing Newport's sales of Lexington stock received from Pierce.  Additionally, the Division submitted many exhibits to establish Pierce's sales of Lexington stock through his associates, Newport and Jenirob.[9]

**D.     During the First Proceeding, the Division Sought Additional Disgorgement from Pierce for Trading in Newport and Jenirob Accounts Based on New Evidence.**

After the close of the three-day hearing, the Division "moved for the admission of [the Liechtenstein records]" and argued that Pierce should be liable for a larger amount than previously requested."[10]  The Division reminded the ALJ

---

[8] JA 373-79 (Division's Pre-Hearing Brief).
[9] JA 401-15 (the Schedule 13D); JA 416 (chart of Lexington shares moving to and from Newport); JA 417-42 (transfer of 435,000 Lexington shares to Jenirob in January 2004, Pierce's instructions to Hypo Bank to book sales of Lexington shares to Jenirob, statements for Newport bank account showing $1.7 million from Jenirob and $900,000 from unspecified Hypo Bank account).
[10] *See* JA 845 (Opinion at 7); *see also* JA 96-103 (Division's Motion for Admission of New Evidence).

that the Order Instituting the Proceeding alleged "Pierce orchestrated an illegal distribution of Lexington stock . . . in total approximately $13 million in proceeds were generated . . . as a result of Pierce's illegal distribution."[11]   The Division pointed to the Hypo Bank records as establishing that "the vast majority" of those sales were of shares Pierce had "transferred to Newport or the other offshore companies; [which were] then sold by Pierce into the open market through Hypo Bank.  Therefore . . . Pierce received millions of dollars in additional ill-gotten gains."[12]

The Division's proposed findings and conclusions and post-hearing brief sought disgorgement for $9.601 million including not only $2.078 million in trading profits from Pierce's Hypo Bank account but also $5.454 million and $2.069 million in trading profits from the respective Newport and Jenirob accounts at Hypo Bank.[13]   Pierce was characterized as an "underwriter" by engaging in a distribution of Lexington stock.[14]

---

[11] JA 101 (*id.* at 6).

[12] JA 102 (*id. at* 7) (emphasis added).

[13]  JA 114 (Division's Proposed Findings and Conclusions at ¶¶ 56-57).   The proposed findings were that Newport and Jenirob were offshore companies whose Hypo Bank accounts were controlled by Pierce and that Hypo Bank traded for those accounts through its omnibus vFinance account.  JA 109, 110, 113-14 (*id.* ¶¶ 32, 34, 54-58).   The proposed conclusions of law were that Pierce should disgorge $9,601,347 in net proceeds from sales of S-8 shares through Hypo Bank and vFinance, using Newport and Jenirob as well as his personal account.  JA 125 (*id.* ¶¶ 51, 53).

[14] JA 122 (*id.* ¶ 28) (proposed conclusion).

The Division's post-hearing brief trumpeted the same claim—Pierce should be required to disgorge the $9.6 million he allegedly obtained from trading in his own account and those of his "offshore companies" Newport and Jenirob.[15]

## E.    The ALJ's Initial Decision Admitted the New Evidence But Deferred to the Commission to Address Disgorgement from Those Accounts.

The ALJ ruled "that the new evidence would be admitted on the issue of liability but not on the issue of calculating disgorgement."[16]  The rationale was that "these entities are not mentioned in the OIP, and such disgorgement would be outside the scope of the OIP," because "the Commission has not delegated its authority to administrative law judges to expand the scope of matters set forth for hearing beyond the framework of the original OIP."[17]

Two months later, the ALJ issued the initial decision relying upon the new evidence of Pierce's sales from the Newport and Jenirob accounts but ordering Pierce to disgorge only $2,043,362.33, the "actual profits Pierce obtained from his wrongdoing."[18]   The ALJ again ruled that disgorgement would not include proceeds from Newport and Jenirob accounts, because the Commission had not

---

[15] JA 91 (Division's Post-hearing Brief at 25).
[16] *See* JA 149 ( Apr. 7, 2009 Order Granting Admission of New Evidence at 2)
[17] JA 149 (*id. at* 2 n.3) (the hearing officer's invitation to the Division to ask the Commission to expand the scope of the OIP)).
[18] JA 170 (Jun. 5, 2009 Initial Decision at 21).

delegated to hearing officers its authority to expand the scope of matters set for hearing beyond the framework of the OIP.[19]

**F.    The Division Did Not Appeal the Initial Decision, and the Commission Adopted the Decision as its Final Order.**

The Division had four options to keep the $7.5 million claim alive until a final decision in the First Proceeding.  First, it could have asked the Commission for interlocutory review of the ALJ-Hearing Officer's evidentiary decision under Rule of Practice 400(a).  Second, it could have asked the Commission to admit the new evidence under Rule of Practice 452.  Third, it could have asked the Commission to expand the scope of the OIP under Rule of Practice 200(d)(l) as the ALJ had suggested.  Fourth, if it believed the Initial Decision had misconstrued the scope of the OIP's allegations about Pierce's associates and offshore companies, it could have appealed the Initial Decision to the Commission pursuant to Rule of Practice 410.  The Division passed up all these opportunities, and allowed the Initial Decision to become final, on July 8, 2009.[20]

Neither party appealed the initial decision, which then "became the final decision of the Commission on July 8, 2009."[21]

---

[19] JA 169-70 (*id. at* 20-21).
[20] JA 269-70 (July 8, 2009 notice that initial decision became final).
[21] JA 269 (*id.* at 1).

**G.     The Commission Brought a Second Proceeding for the Same Disgorgement that Was Relinquished in the First Proceeding.**

Six months after the final order, the Division advised Pierce that it intended to launch a second administrative proceeding to disgorge profits from the very same Newport and Jenirob trades for which disgorgement was sought in the First Proceeding.[22]   Pierce responded the following month with a Wells Submission raising a res judicata defense.[23]

Undeterred, the Division persuaded the Commission to institute a Second Proceeding for the same additional disgorgement remedy that had been relinquished in the First Proceeding.   *In the Matter of Gordon Brent Pierce, Newport Capital Corp., and Jenirob Company Ltd*., Admin. Proc. File No. 3 13927 (Securities Act Release No. 9125) (June 8, 2010).[24]   The only difference was that the Division relied on collateral estoppel against Pierce from the First Proceeding and added Newport and Jenirob as respondents in the Second.

In the Second Proceeding, the ALJ decided the matter on summary disposition/summary judgment.   The ALJ ruled that Pierce had established his res judicata defense but held the fraudulent concealment exception avoided the res judicata bar.[25]   Additionally, the ALJ ruled that Pierce failed to establish the

---

[22] JA 441-42 (January 12, 2010 letter from the Division).
[23] JA 171-85 (Wells Committee Submission to SEC).
[24] JA 1-9 (June 8, 2010 Order Instituting Cease-and-Desist Proceeding, or the "Second OIP").
[25] *Gordon Brent Pierce*, Initial Decision, Release No. 425, 2011 SEC LEXIS 2564

affirmative defenses of waiver, equitable estoppel and judicial estoppel. The ALJ imposed a cease-and-desist order against Pierce and granted the additional disgorgement of $7.5 million plus interest.[26]

After Pierce appealed the ALJ's Initial Decision in the Second Proceeding, the Division cross-appealed on the question of res judicata applying. The Commission reversed on the cross-appeal and ruled that res judicata did not apply.[27] Although the Commission denied Pierce's reconsideration motion,[28] the Commission granted his motion to stay the enforcement of the disgorgement remedy until this Court decides his petition for review.[29]

## H.    Pierce Satisfied the Disgorgement Order in the First Proceeding.

Earlier, on the very same day it initiated the Second Proceeding, the Commission applied in federal district court for an order requiring Pierce to pay the $2.9 million ($2.1 million plus interest) disgorgement award from the First Proceeding. *SEC v. Pierce*, No. CV 10-80129 (N.D. Cal.).[30] Pierce completed

---

(July 27, 2011).
[26] 2011 SEC LEXIS 2564 at *55-60.
[27] JA 850-56 (Opinion at 12-18), 2014 SEC. LEXIS 839 (Mar. 7, 2014).
[28] *In re Gordon Brent Pierce*, Order Denying Mot. for Recons., Secs. Act of 1933 Release No. 9584; Secs. Exch. Act of 1934 Release No. 72174, 2014 SEC LEXIS 1671 (May 15, 2014).
[29] *In re Gordon Brent Pierce*, Order Granting Mot. for Stay, Secs. Act of 1933 Release No. 9598; Secs. Exch. Act of 1934 Release No. 72354, 2014 SEC LEXIS 1996 (June 9, 2014).
[30] JA 186-92 (SEC Application for Order Enforcing Administrative Disgorgement).

payment to the Commission and satisfied the final order of disgorgement in February 2011.[31]

## SUMMARY OF ARGUMENT

By flouting its own rules to undermine bedrock law, including res judicata, equitable and judicial estoppel and waiver, the Commission has exceeded the bounds of its authority.

"Res judicata ensures the finality of decisions. . . . Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Brown v. Felsen*, 442 U.S. 127, 131 (1979) (citing *Chicot Cnty. Drainage Dist. v. Baxter St. Bank*, 308 U.S. 371, 378 (1940)).

Under res judicata, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979). "The doctrine of res judicata serves vital public interests beyond any . . . ad hoc determination of the equities in a particular case." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981).

The Supreme Court has long favored administrative claim preclusion (res judicata). *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107-110 (1991). The few exceptions cited in the Opinion are to resolve interagency

---

[31] JA 456-57 (email acknowledging final payment)).

overlap, recognize intervening changes in the law, or, more typically, ameliorate harsh results against a downtrodden individual overwhelmed by an agency's power and resources. Those exceptions do not apply here. The Commission cannot clothe itself in the rags of the poor to shirk its responsibility to follow the law just as surely as it enforces the law.

The Commission erred in finding that the doctrine of fraudulent concealment applied. Pierce did not fraudulently conceal facts from the Division during the First Proceeding. Further, the Division did not exercise diligence in pursuing its claim for disgorgement based on sales in the Corporate Accounts that was available in the First Proceeding. Far from being concealed, the $7.5 million claim was actually asserted by the Division in the First Proceeding.

## STANDING

Pierce has standing to challenge the Commission's orders requiring him to disgorge over $11 million, because the orders directly injure him.

## ARGUMENT

### A.    Standard of Review

Under the Administrative Procedure Act, this Court will reverse sanctions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* 5 U.S.C. § 706(2)(A); *Rapoport v. SEC*, 682 F.3d 98, 103 (D.C. Cir. 2012); *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1092-93

(D.C. Cir. 2005) (citing *Graham v. SEC*, 222 F.3d 994, 999-1000 (D.C. Cir. 2000)).

## B.  The Commission Committed Manifest Error by Misconstruing Black-Letter Law Governing the Doctrine of Res Judicata.

"The principle underlying the rule of claim preclusion is that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not to have another chance to do so."  Restatement (Second) of Judgments, Ch. 1, Introduction at 6 (1982).  "One major function of claim preclusion is to force a *plaintiff* to explore all the facts, develop all the theories, and demand all the remedies in the first suit."  18 Charles A. Wright et al., *Federal Practice and Procedure* § 4408, at 188 (2013) (emphasis added).  Moreover, in this context "claim" is broadly defined "to embrace all the remedial rights of the plaintiff against the defendant growing out of the relevant transaction (or series of connected transactions)."  Restatement (Second) of Judgments, § 24 cmt. a.

The Opinion reverses the ALJ's decision that the elements for res judicata were met.  JA 848 (Opinion at 10).  Relying in part on decisions not cited by the parties, the Commission concluded incorrectly that the proceedings do not involve "the same cause of action."  JA 852-56 (*id. at* 14-18).  The Opinion rules that the First Proceeding discretely adjudicated a claim based on Pierce's sales through "the Personal Account," leaving a separate $7.5 million claim based on sales from the "Corporate Accounts" for a Second Proceeding.  JA 853-54 (*id. at* 15-16).

14

The Opinion's rationale for finding that there was no identity of claims between the First and Second SEC proceedings is that "registration of a security is transaction-specific . . . requir[ing] an inquiry into whether those securities have been registered, or whether an exemption applies, with respect to that *particular* offer or sale."  JA 853 (Opinion at 15) (citations omitted).  But this rationale is completely unsupported by any precedent, and it sidesteps the relevant analysis of whether the underlying facts and evidence overlap.  In a series of connected transactions, each transaction may be dissected and analyzed under the relevant legal standards, while the proof still overlaps.

With respect to sales in the Personal and Corporate Accounts, the facts to determine registration and whether any exemptions to the registration requirement applied were substantially similar.  As the Opinion acknowledges, no registration statement was filed for any of Pierce's sales of Lexington stock.  *Compare* Opinion at 11-12 and n.28 (JA 849-50) with Opinion at 9-10 (JA 847-48).  Thus, this overlapping lack-of-registration finding and the evidence to establish it were identical for the transactions in the Personal and Corporate accounts.  Further, the facts to determine whether an exemption was available were also substantially the same. *Compare* JA 847 (Opinion at 9) (Pierce's answer to Second OIP admitted, among other things, his control of Lexington), *with* JA 846 (Opinion at 8) (ALJ found in the First Proceeding that Pierce's control of Lexington made him an

affiliate of Lexington, which brought him within the statutory definition of issuer, and he therefore could not take advantage of the Section 4(1) exemption for sales not involving an underwriter). Thus, the ALJ in the Second Proceeding was able to base the findings on the findings of fact in the First Proceeding. JA 848 (Opinion at 10).

The Opinion's citation to *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1463-64 (2d Cir. 1996) (citations omitted) does not support the Commission's argument because *First Jersey* involved a second set of transactions that occurred years after the first set of transactions: at the time the SEC filed its first set of charges and throughout the period of the hearing, the second set of transactions had not yet occurred. *Id. at* 1463-64 (first set of transactions occurred 1975-79 and second set occurred 1982-85).

The Opinion's analysis represents a manifestly impermissible attempt to split "a series of connected transactions" into artificially separate subject matters in two successive proceedings. Under the Restatement, "fairness to the defendant" entails treating as a single claim "acts which though occurring over a period of time were substantially of the same sort and similarly motivated." Restatement (Second) of Judgments, § 24 cmt. d. In short, a "claim" in this context is "the counterpart of transaction as an aggregate of facts which in various combinations, all comprising a common core or nucleus of the facts, may support a number of

substantive legal theories with corresponding remedies." *Id*., Reporter's Note to cmt c.

Both proceedings sought the disgorgement of sales of unregistered Lexington shares. Both submitted the same evidence. Both drew on the same series of connected transactions and on the same common core or nucleus of facts. *E.g*., "Pierce orchestrated an illegal distribution of Lexington stock . . . in total approximately $13 million in proceeds were generated . . . as a result of Pierce's illegal distribution." JA 101 (Division's Motion to Admit New Evidence at 6) (emphasis added). This common core or nucleus of facts occurred prior to either proceeding (some four years prior to initiation of the First Proceeding and six years prior to initiation of the Second). After submitting the claim for additional disgorgement, the Division declined to push forward "to . . . demand all the remedies in the first" proceeding, as required by the doctrine of res judicata. 18 *Fed. Practice and Procedure* § 4408, at 188 (2013). The Commission tries to avoid the consequences of that decision by invoking the "fraudulent concealment" exception to res judicata, but as explained below, that exception does not apply.

## 1. The Claims Were Raised, Merged and Extinguished in the First Proceeding.

The First Proceeding precludes the additional disgorgement remedies, because the remedies "'were or could have been raised in' the prior action." JA 690-91 (ALJ Decision at 13-14 (citing *San Remo Hotel v. City & Cnty. of S.F.*,

*Cal.*, 545 U.S. 323, 336 n.16 (2005)).    That outcome is a straightforward application of black-letter law.  The $7.5 million claim not only existed at the time the First Proceeding was pending, but it was actually "asserted" in the First Proceeding, in contrast to cases ostensibly underpinning the Opinion.  *See*, *e.g*., JA 845-46 (Opinion at 7-8).

The Commission had full authority to determine liability and disgorge profits from Pierce in the First Proceeding, even for the $7.5 million profits of the two "offshore" companies (Newport and Jenirob).    The Division asked for disgorgement of this $7.5 million from Pierce because he was a respondent and allegedly responsible for the unregistered sales by these "associates."    Yet, the Opinion concludes that "liability for those sales was beyond the scope of that proceeding."    JA 855 (Opinion at 17) (emphasis added).    The Opinion emphasizes that the ALJ in the First Proceeding ruled against the Division's request to disgorge another $7.5 million "on the grounds that such a request was not part of that proceeding and that she did not have authorization to add it."    *Id*. (emphasis added).    But these two quotations from the Opinion demonstrate how the Opinion misconstrues the record as well as the ALJ's statements in the Initial Decision and her prior April 7, 2009 ruling in the First Proceeding.

The ALJ in the First Proceeding never ruled that the Division's request to disgorge an additional $7.5 million from Pierce "was beyond the scope of that

18

proceeding" or "was not part of that proceeding." *Id.* Undeniably, the $7.5 million claim was made in multiple pleadings and addressed by the ALJ -- it was part of that proceeding. And there was never a ruling by the ALJ or the Commission that the $7.5 million claim was "<u>beyond the scope of that proceeding</u>." The ALJ ruled only that the claim "would be outside the scope of the OIP" and "[t]he Commission has not delegated its authority to administrative law judges to expand the scope of matters set down for hearing beyond the scope of the original OIP." JA 149 (April 7, 2009 Order at 2) and JA 169-70 (June 5, 2009 Initial Decision at 20-21) (emphasis added).[32]

Regarding the additional disgorgement, the ALJ in the First Proceeding did not rule that the Division "must enforce [the $7.5 million claim], if at all, in another proceeding," preserving the claim from preclusion. *See* § 26 cmt. d. Instead, the ALJ in the First Proceeding pointed to the Commission's ability to amend the OIP. The insurmountable obstacle is the Commission's final order in First Proceeding. The final order did not "expressly reserve the . . . right . . . to maintain the second action," which would have been a permissible means of claim

---

[32] Any ruling by the ALJ—*e.g.*, deferring to the Commission on the $7.5 million Corporate Accounts claim—is subject to independent review by the Commission. The deferral is directly analogous to a subordinate ruling by a special master appointed by a federal district court deferring to that court. Fed. Rule of Civ. Proc. 53. Any ruling by the ALJ must be challenged before the district court, under the prescribed procedures, *id.*, just as the amount of disgorgement granted by a hearing officer must be challenged under the Commission's procedures before it becomes a final order of the Commission.

splitting under §26(1)(b)—but would have revived Pierce's defenses and appeal rights.   The assertion of the $7.5 million claim combined with the failure to expressly reserve the claim triggered merger and bar under the doctrine of res judicata.   *See Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 989 (9th Cir. 2005) (applying res judicata to claims dismissed without prejudice upon the denial of leave to amend).

### a.   The operative events preceded the filing of the First Proceeding.

All of the conduct alleged in both the First and Second Proceedings occurred years before the First Proceeding.   This timing makes the application of res judicata clear-cut in this case.   Many of the citations in the Opinion support this black-letter law principle.   JA 860 (Opinion at 22 n.58) (citations discussing "bright line" rule that res judicata does not apply to events post-dating the filing of the initial complaint).

This is not one of the bright-line situations in which res judicata does not apply due to new events occurring after the initiation of the First Proceeding. JA 860 (Opinion at 22 n.58) (citing *Morgan v. Covington Twp.*, 648 F.3d 172, 177-78 (3d Cir. 2011)).[33]   Courts have adopted "a brightline test that res judicata

---

[33] *See, e.g.*, *Proctor v. LeClaire*, 715 F.3d 402, 412-13 (2d Cir. 2013) (pro se prisoner's claims asserted in a 2009 suit based on periodic reviews of his segregated status conducted every 60 days included new reviews post-dating his 2008 suit) (cited in JA 856 (Opinion at 18 n.51)); *First Jersey*, 101 F.3d at 1464 (holding res judicata did not apply because "[t]he claim that First Jersey defrauded

does not apply to events post-dating the filing of the initial complaint." 648 F.3d at 177. The bright line test making post-filing events the basis for either (1) discretionary supplemental claims joined in the original suit, or (2) preserved claims reserved for a new suit, does not apply here. This is a classic res judicata case in which pre-filing events were raised and then abandoned.

Worse yet, the Opinion at 22 n.58 (JA 860) further relies on authority that actually supports Pierce's position. *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.*, 750 F.2d 731, 739 & n.9 (9th Cir. 1984), applied res judicata to bar a second case falling within the agreed scope of claims adjudicated in the first case. "There is no manifest injustice in denying plaintiffs the opportunity to relitigate a part of a claim when they had a previous opportunity to do so but elected against it." *Id. at* 745. The Division had exactly such an "opportunity," having brought the $7.5 million claim prior to an initial decision by the ALJ. Prosecuting the claim fully in the First Proceeding required nothing more than compliance with Commission rules.

The $13 million in illegal sales occurred "between February and July 2004"—years before the initiation of the First Proceeding. JA 37-42 (First OIP). The July 31, 2008 OIP in the First Proceeding captures those transactions under the

---

customers in the sale, purchase, and repurchase of certain securities in 1975-1979 is not the same as the claim that First Jersey defrauded customers in . . . 1982-1985") (cited in JA 860 (Opinion at 22 n.58)).

definition of "claim" for purposes of merger and bar set forth in § 24(a).  The final

order extinguished the Commission's claims: "the claim extinguished includes all

rights of the plaintiff to remedies against the defendant with respect to all or any

part of the transaction, or series of connected transactions, out of which the action

arose."  *Id.*  In turn, comment b explains how there is a "delicate balance" between

the defendant's interests and the plaintiff's interests so that the expression

"transaction, or series of connected transactions" is a "natural grouping or common

nucleus of operative facts."  § 24(a) cmt. b.

    The Opinion quotes "§ 24(a)" as stating, "[e]quating claim with transaction,

however, is justified only when the parties have ample procedural means for fully

developing the entire transaction in the one action going to the merits to which the

plaintiff is ordinarily confined."  JA 850 (Opinion at 12 n.33).[34]  But the fact that

the claim was asserted and the evidence admitted demonstrates the Commission

had "ample . . . means" and "a chance to litigate."  § 24(a) cmt. a; Restatement

(Second) of Judgments, Ch. 1, Introduction at 6.  Thus, even if the $7.5 million

disgorgement claim arose from a different distribution, the claim was still

extinguished.  Not only did the Division have a "chance to litigate," it actually

started the process of litigating before aborting the $7.5 million claim in favor of

finality of the $2.1 million plus interest disgorgement order.

---

[34] The quotation is from comment a—not § 24(a).

**b.      The proofs in the first and second proceeding overlap.**

The Opinion also dodges the dispositive presumption regarding overlapping proofs.   Convenience is a factor making "it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first.  If there is a substantial overlap, the second action should ordinarily be held precluded.   But the opposite does not hold true; even when there is not a substantial overlap, the second action may be precluded if it stems from the same transaction or series."   Restatement (Second) of Judgments, § 24 cmt. b.  The Opinion ignores the "substantial overlap" of proof, raising the presumption of preclusion under § 24(a) comment b.  *See* JA 844, 849 (Opinion at 6, 11) (sales from personal accounts in June 2004 and sales from "Corporate Accounts in February to December of the same year).[35] Compare the Initial Decision in the First Proceeding, JA 150-70, to JA 1-9, the OIP in the Second.  The overlapping proof is comprehensive.

When "a defendant is accused of successive but nearly simultaneous acts . . . substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same

---

[35] The ALJ in the First Proceeding denied Pierce's exemption from registration defense under § 4(1) of the Securities Act of 1933 (not an "issuer, underwriter or dealer").   JA 155, 165-66 (June 5, 2009 Initial Decision at 6, 16-17) ("Pierce traded Lexington stock on behalf of Newport in all these accounts").  The ALJ did not limit the evidence or analysis to transactions in S-8 stock in Pierce's personal accounts.

action.  The events constitute but one transaction or a connected series."  § 24(a) cmt. d.  Here, the Division contended and the Commission found that Pierce's $2.1 million personal account proceeds and the $7.5 million "Corporate Accounts" proceeds of Newport and Jenirob were all part of the same underwriting "orchestrated" by Pierce that violated Section 5 of the 1933 Act and generated $13 million in illegal proceeds to "Pierce and his associates."

**2.    The Recognized Exceptions for Relaxing Administrative Res Judicata Do Not Apply.**

The general rule is that administrative res judicata applies to "a valid and final adjudication by" an agency "subject to the same exceptions and qualifications, as a judgment of a court."  §83.  The Division failed to establish any such exceptions and qualifications.

Perhaps recognizing that it is playing fast and loose with the legal standards for res judicata, the Opinion relies heavily on this being an administrative adjudication, in which the rules should somehow be more forgiving.  *E.g.*, JA 850, 861-62 (Opinion at 12 nn.33, and at 23-24).  But there is no support for the Opinion's broad application of an "administrative exception."   The Opinion confounds this doctrine, resulting in a manifest error of law.   There is no free-floating, public policy/cost-benefit exception applicable to the res judicata effect of the First Proceeding.  *Compare* Opinion at 17, 24-25 (JA 855, 862-63), with *Moitie*, 452 U.S. at 401 ("doctrine of res judicata serves vital public interests

beyond any individual judge's ad hoc determination of the equities in a particular case").

There are three recognized administrative exceptions to res judicata, and none are present here. All of the cases cited in the Opinion concern these three exceptions and none of the cases supports application of an administrative exception in this matter.

### a. Among agencies, the Commission had exclusive authority.

In this case, there was no overlapping agency jurisdiction, which is one of the narrow grounds enumerated in case law for applying res judicata more flexibly in an administrative context. The Opinion cites to § 83 comment g for the proposition that "'the qualifications and exceptions to the rule of claim preclusion have particular importance to administrative agencies' because, in contrast to Article III courts, the jurisdiction of agencies is more limited." JA 850 (Opinion at 12 n.33). But comment g compares courts of general jurisdiction with "the jurisdiction of administrative agencies [that] is usually framed in terms of specified substantive legal provisions, for example, . . . regulation of a specified business . . ., etc." § 83 cmt. g. Here, the SEC indisputably had subject-matter authority over the "substantive legal provisions" (the registration act claims and disgorgement remedies) asserted in the two proceedings.

25

The Opinion relies on distinguishable decisions resolving problems caused by overlapping agency jurisdiction.  JA 862 (Opinion at 24 n.70) (citing *Cartier v. Sec'y of State*, 506 F.2d 191 (D.C. Cir. 1974) (overlapping jurisdiction of the INS, Secretary of State, and Attorney General and interplay regarding nationality determinations)); JA 851 (Opinion at 13 n.34) (citing *Candelario v. Postmaster Gen. of United States,* 906 F.2d 798, 801 (1st Cir. 1990) (overlapping jurisdiction of the EEOC and Postal Service)).

The Opinion relies on *Candelario* for the proposition that "in the context of administrative proceedings, res judicata is not automatically and rigidly applied in the face of contrary public policy."  JA 851 (Opinion at 13).  But *Candelario* merely presents an established exception to res judicata in the context of interagency comity.  The interests of administrative efficiency favor that the agency employing a complaining public employee should decide his or her opportunities for promotion and lost wages, while the EEOC decides liability on discrimination claims.  906 F.2d at 802.  The First Circuit ruled that administrative res judicata did not bar the Postal Service from asserting a mitigation of damages defense, where the regulations did not specify which agency would determine back pay, where "in typical proceedings the EEOC does not compute back pay in the first instance," and where the statutory mandate in compliance proceedings before

the court was "to reduce the back pay otherwise allowable" with the earnable amount.  *Id. at* 801.

The *Cartier* decision's tempering of administrative res judicata involved the "sympathetic picture" of a nationalized citizen's efforts to undo his surrender of citizenship made eight years earlier to live with his children whose mother lived abroad.  506 F.2d at 193-94.  The decision is framed within the shared authority of the INS, State Department, and Attorney General and the "double-check system" over the administration of immigration and nationality laws and how Congress did not intend to promote "internecine war" between agencies.  *Cartier*, 506 F.2d at 198-99.  The decision distinguishes "cases decided prior to the general judicial acceptance of res judicata to administrative proceedings" and explains how the two agencies felt at liberty to make independent nationality determinations.  *Id. at* 197.  The decision does not support the Commission having unfettered authority to enforce, modify, or "reject" res judicata "when the reasons against applying it outweigh those that favor it" or by applying the hypothetical cost-benefit analysis set forth in the Opinion.  JA 862 (Opinion at 24 & n.70).  Unlike *Candelario* and *Cartier*, this Proceeding does not raise any question of inter-agency jurisdiction.  One agency decided the two Proceedings—the Commission.

###### b.      No intervening change in the constitutional or statutory law.

In this case, there was no change in law to justify departing from the principles of res judicata.  A change in law is a recognized exception to the rule against claim splitting.  "[I]nequities in the implementation of a constitutional scheme may result from inflexible application of the rules of merger and bar, especially when there is a change in law after the initial decision."  § 26(d) cmt. e. For example, a prior suit denying a claim that a school program fosters race discrimination does not bar a later suit based on a change to the law resulting from a subsequent Supreme Court decision.  *Id.* illus. 6.  "[T]he policy of nationwide adherence to authoritative constitutional interpretation overcomes the policies supporting the law of res judicata." *Id.*

Between the First and Second Proceeding, the Supreme Court and Congress did not change the law applied in the First Proceeding.  Yet, the Opinion relies upon decisions where a change in law by Congress overcame the policies supporting administrative res judicata. JA 852 (Opinion at 14 & nn.42-44) (citing *Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs*, 726 F.3d 387, 394 (3d Cir. 2013); JA 863 (Opinion at 25 n.71) (citing *Maldonado v. U.S. Att'y Gen.*, 664 F.3d 1369, 1377 (11th Cir. 2011) and *Duhaney v. Att'y Gen. of the United States*, 621 F.3d 340, 351 (3d Cir. 2010)).  *Marmon* is a prime example of an intervening change in the law, granting new rights.  The award of Black Lung

28

benefits to a miner in 1985 and the denial of benefits to his widow in 2006 did not bar a later claim by the widow under the Patient Protection and Affordable Care Act (the "ACA"), which was adopted four years later in 2010. The ACA amended the prior act, reinstating automatic entitlement to benefits for surviving dependents. 726 F.3d at 389-91. This created a different cause of action, entailing different elements and proof. *Id. at* 393-95.

The Opinion takes another statement about "res judicata applying more flexibly in an administrative context" out of the operative context—another change of law permitting a new claim. JA 862-63 (Opinion at 24-25 n.71) (citing *Maldonado*, 664 F.3d 1369). There the Eleventh Circuit denied a res judicata defense after Congress adopted a new law in 1996 expanding the definition of aggravated felony to include sexual abuse of a minor, creating a new basis for a deportation proceeding in 2009. "[W]e will not apply the doctrine of res judicata . . . when an intervening change in the law has provided a wholly new legal basis for removal that could not have been raised in the prior proceedings, particularly when Congress clearly intended that new basis to apply retroactively." *Maldonado*, 664 F.3d at 1379-80. Congress expressly made the new definition retroactive, averting a preclusion defense. *Id. at* 1379.

Another cited decision applies the same retroactive statute to deny a res judicata defense. *Duhaney*, 621 F.3d at 351. But in Pierce's case, between the

29

First and Second Proceeding, no intervening change in law occurred to defeat res judicata, so these decisions and their logic do not apply.

### c.  The Commission was not a pro se party lacking procedural safeguards.

The third category in which res judicata is relaxed in administrative proceedings likewise does not apply in this case because the category serves to protect pro se and unsophisticated litigants.   The Division was not an unrepresented party lacking procedural safeguards or participating in a paper hearing as in an initial determination under the Social Security Administration's procedures, where there is a long recognized relaxation of the doctrine of res judicata.[36]   Yet, the Opinion relies upon the social security, social welfare and immigration cases, where preclusion is relaxed in favor of a pro se plaintiff or due to the lack of procedural safeguards.   JA 862-63 (Opinion at 24-25 nn.70-74) (citing *Maldonado* and *Cartier*, distinguished above).

One of the cited decisions tempering the application of res judicata is *Thompson v. Schweiker*, 665 F.2d 936, 940 (9th Cir. 1982).  But the "tables were turned" from this case.  There, Secretary of Health and Human Services had denied

---

[36] *See*, *e.g.*, *Purter v. Heckler*, 771 F.2d 682, 691-92 (3d Cir. 1985).  "[W]hen res judicata is applied in the context of administrative proceedings under the [Social Security] Act, it is not encrusted with the rigid finality that characterizes its application in purely judicial proceedings. . . .   Because claimants under the Act are generally without the assistance of counsel and are involved in a review process not safeguarded by adversarial concepts, we recognized . . . , that we must take a flexible approach . . . tempered by fairness and equity . . . and in accordance

Thompson's claim for Supplemental Security Income benefits based on the res judicata effect of the denial of an earlier claim. Thompson suffered from epilepsy, alcoholism, respiratory disease and knee fractures, and was a hospitalized ward resident in a VA hospital for years. *Id. at* 937. At the hearing during which the ALJ determined res judicata applied, the ALJ cross examined Thompson in an adversarial fashion, although Thompson had no attorney, and the ALJ failed to fulfill his duty "to scrupulously and conscientious probe . . . and explore all the relevant facts," including those helpful to Thompson. *Id. at* 941. The Ninth Circuit held Thompson failed to receive a fair hearing and "the ALJ improperly invoked the res judicata doctrine." *Id.*

This case is entirely different from the case involving the unsophisticated, lawyerless and debilitated Thompson. The Enforcement Division is staffed with battalions of legal talent vigorously prosecuting the Commission's interests in its administrative proceedings. Staff attorneys know the Commission's rules as well as, if not better than, anyone else. In this case they consciously ignored those rules despite the clear statements of the ALJ regarding the need to amend the OIP. JA 149 (April 7, 2009 Order at 2 n.3); JA 169-70 (June 5, 2009 Initial Decision at 20-21). Ironically, the point of *Thompson* is to apply res judicata flexibly to *prevent an agency from abusing the power inherent in its own administrative*

_____

with the beneficent purposes of the Act." *Id. at* 691.

31

*channel*, not to endorse such abuse. *Thompson* is not a proper analog for the Commission.

Nor is *Martin*, where a worker's failure to appeal an initial unemployment determination within 20 days did not have res judicata effect. *Martin v. Donovan*, 731 F.2d 1415 (9th Cir. 1984). There the ALJ did not inform the worker that failure to appeal the decision might bar a challenge to a later finding of ineligibility under a federal statute providing benefits to those impacted by the expansion of Redwood National Park. *Id. at* 1416. Again, res judicata was relaxed not to expand an agency's power to ignore its rules, but to curb the agency's abuse of power over an individual trapped within its administrative forum.

## C.  The Opinion Erred by Applying the Doctrine of Fraudulent Concealment.

The Opinion labors to explain how the fraudulent concealment exception to res judicata can possibly apply when the cause of action and supporting evidence central to a second case were actually submitted in the first case. JA 856-61 (Opinion at 18-23). Here, even assuming Pierce's actions amounted to fraudulent concealment of trades generating the $7.5 million disgorgement claim, any concealment ultimately failed. The Division captured the cause of action and supporting evidence in time to seek disgorgement in the First Proceeding, in which

the Commission had ample power to adjudicate the claim to conclusion without depriving Pierce of his defenses and appeal rights.[37]

The Opinion provides no case that applies the fraudulent concealment exception when the cause of action—as in this case—was actually asserted in briefs, discussed in orders, and fell within the power of the agency or court to adjudicate in the first case.[38]  Instead, the Opinion relies on cases that actually *rejected* the application of the exception for similar (or even weaker) reasons. JA 856 (Opinion at 18 n.52).[39]

In *Guerrero v. Katzen*, 774 F.2d 506, 508 (D.C. Cir. 1985), the court affirmed summary judgment dismissal on the basis of a res judicata defense, even though "there was the discovery of two pieces of relevant evidence *after* judgment

---

[37] Pierce also maintains that he did not fraudulently conceal any facts from the Commission. *See SEC v. Wyly*, 950 F. Supp. 2d 547 (S.D.N.Y. 2013) (in analyzing fraudulent concealment exception to running of statute of limitations, discussing *Gabelli v. SEC*, 133 S. Ct. 1216 (2013), and holding that fraudulent concealment exception is narrow and that *Gabelli* implies that acts of concealment representing an unwillingness to divulge the allegedly wrongful activity are not grounds for tolling an SEC enforcement action) (citations omitted)).  Pierce also maintains that the Division was not diligent in attempting to uncover the facts underlying the Second Proceeding, and that the Division further was not diligent in fully pursuing the additional disgorgement relief once this claim had been asserted in the First Proceeding.

[38] Indeed, one court has noted that the fraudulent concealment exception to res judicata "appears to be rarely invoked as the basis for a judicial decision." *American Hoist & Derrick Co. v. Manitowoc Co.*, 1990 U.S. Dist. LEXIS 18569, *66 (N.D. Ill. Dec. 14, 1990).

[39] *E.g.*, *Mpoyo*, 430 F.3d at 988-89 ("Permitting these later-filed claims to proceed would create incentive for [parties] to hold back claims and have a second adjudication"); *L-Tec Elect. Corp. v. Cougar Elect. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999) (lack of due diligence precludes fraudulent concealment exception). The existence of "a deliberate misrepresentation," by itself, is insufficient.

was entered." (Emphasis added.) The court concluded: "Clearly, [he] could have litigated the significance of his alleged newly discovered evidence in [the earlier proceeding] and, therefore, he may not raise it here." *Id.* In *Guerrero*, the evidence was discovered "*after judgment*" and during the pendency of the appeal in the first case. Here, the new evidence in the First Proceeding was discovered and the $7.5 million claim asserted *before* the ALJ had even made a *preliminary* decision in the First Proceeding.

The Opinion not only ignores the plain facts, but it further misconstrues the test for fraudulent concealment, distorting the analysis in § 26, comment j, by using a partial quote. JA 860 (Opinion at 22). The passage, quoted below comment j, posits that a misrepresentation defense to a contract was unknown before the contract had been adjudged enforceable in a previous action involving a competency challenge. The concealed misrepresentation defense would not be barred in a second action to cancel the contract. But that would certainly not be the result if the misrepresentation defense *had been submitted* in the first action:

> A defendant cannot justly object to being sued on a part or phase of <u>a claim that the plaintiff failed to include in an earlier action</u> because of the defendant's own fraud
>
> ***
>
> [or when] an innocent misrepresentation <u>prevented the plaintiff from including the entire claim in the original action</u> . . . The result is different, however, where the failure of the plaintiff to include the entire

---

*Costantini* v. *Trans World Airlines*, 681 F.2d 1199, 1202-03 (9th Cir. 1982).

claim in the original action was . . . not caused by the defendant's fraud
or innocent misrepresentation.

§ 26 cmt. j (emphasis added). Here, any fraudulent concealment by Pierce did not

prevent the Division from bringing the $7.5 million claim in the First Proceeding.

The Division brought the "unconcealed" claim but elected not to preserve it.[40]

In the face of these overwhelming facts, the Opinion manufactures a new

principle out of whole cloth: "In cases where additional misconduct occurs after a

suit is filed but is discovered before a final judgment is issued, the courts have held

that there is no obligation to amend the complaint to add claims based on the

additional misconduct. . . . We believe that the reasoning in these cases is equally

applicable in cases where, as here, additional misconduct occurs before a suit is

filed but is not discovered until after the suit is commenced, 'at least where the

plaintiff contends the [additional misconduct] was unknown due to [the]

defendant's fraud.'" JA 860-61 (Opinion at 22-23) (citations omitted). Thus, the

Opinion takes an element of the law of res judicata—that res judicata does not

apply to subsequent conduct occurring after the filing of the first complaint—and

contorts this principle to buttress the Opinion's fraudulent concealment argument.

---

[40] In *Magnus Elec., Inc. v. La Republica Argentina*, 830 F.2d 1396, 1401-03 (7th
Cir. 1987), the plaintiff asserted the same exception to the res judicata bar and, like
the Division in this case, failed to follow available procedures after the denial of its
motion to amend and after the initial dismissal of its case. A second action was
barred by res judicata.

Not only does the Opinion cite to no case law supporting its twisting of this principle,[41] but its analysis is flawed and illogical.

The Opinion first argues that this principle should be so drastically expanded because the impact on the plaintiff in both circumstances is the same.   JA 861 (Opinion at 23).   The Opinion states that, in both cases, the plaintiff is unaware of the evidence necessary to establish the defendant's additional misconduct until after the initiation of the first lawsuit.   *Id.*   But the Opinion offers no reason why the plaintiff should be allowed to sit on newly-discovered evidence that arises after filing but before the conclusion of the first proceeding, when this would frustrate the policies and goals of res judicata, and when it is absurd on its face to say that newly-discovered evidence was "fraudulently concealed."   The Opinion cites to no case supporting its fabrication of new law on this point.

The Commission had ample ability, resources and procedural means to act on the new evidence during the first proceeding.   As the Supreme Court recently

---

[41] While the Opinion fails to cite any case law to support its new theory for res judicata, it also ignores authority from within this Circuit. See *Reynolds v. United States DOJ*, 2014 U.S. Dist. LEXIS 7234, *13, 2014 WL 220679 (D.D.C. Jan. 21, 2014).   In *Reynolds* the district court applied res judicata to bar a second action where "all of the facts and both of these theories were available to [the plaintiff] while [the first case] was pending in the Eastern District of Pennsylvania; yet, [the plaintiff] declined to amend his complaint or appeal the district court's judgment." That is the case here.   The Division was fully aware of all facts related to the Corporate Accounts during the pendency of the First Proceeding, yet it did not amend the OIP or appeal that judgment.   Under *Reynolds*, res judicata bars this action. See *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981) (holding that when a party "permit[s] [a] judgment . . . to become final, [he] forever los[es] the right to relitigate the issues he had an opportunity to raise before that court.").

stated in analyzing the discovery rule in the context of when a claim accrues for

statute of limitations purposes:

> There are good reasons why the fraud discovery rule has not been extended to Government enforcement actions for civil penalties. The discovery rule exists in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury. . . . The same conclusion does not follow for the Government in the context of enforcement actions for civil penalties. The SEC, for example, is not like an individual victim who relies on apparent injury to learn of a wrong. Rather, a central "mission" of the Commission is to "investigat[e] potential violations of the federal securities laws." (citations omitted). Unlike the private party who has no reason to suspect fraud, the SEC's very purpose is to root it out, and it has many legal tools at hand to aid in that pursuit.

*Gabelli v. SEC*, 133 S. Ct. 1216. This analysis in the context of civil penalty

claims applies equally to SEC disgorgement claims.

The Opinion also attempts to support its new twist on fraudulent

concealment by claiming that "special considerations" apply in an administrative

forum. JA 861 (Opinion at 23). The Opinion then cites two special considerations:

that it would have been inconvenient for the Division to attempt to amend the OIP

to include trading in the Corporate Accounts, JA 862 (Opinion at 24), and that

there is an overriding public policy to make securities law violations unprofitable

by ordering disgorgement. JA 863 (Opinion at 25). Nothing in the record supports

the inconvenience excuse. And nothing in the record supports a special public

policy exception having no bounds. That may be true, but it is superfluous. The

Division simply determined that the certainty of an order disgorging $2.1 million served the public interest better than chasing another, uncertain, $7.5 million.

The importance of disgorgement as a remedy does not justify giving *any* party "two bites at the apple."[42]  The public interest in finality and the integrity of an agency that enforces compliance with its rules far outweighs the public interest in the agency flouting its rules so as to increase an already plentiful disgorgement award.  The Division would not be entitled to a second bite in court and should not be allowed to steal one in an administrative adjudication.

## D.     The Opinion Rewards the Division for Not Following the Commission's Rules While Punishing Pierce for Following the Rules.

The Opinion attempts to justify the Division's evasion of the Commission's rules by invoking the policy that "special considerations apply in an administrative forum."   JA 861-62 (Opinion at 23-24).   Essentially, the ends—the need for speed—justify the means: if the Division had followed the rules by formally seeking an amendment, the remedial relief in the First Proceeding would have been delayed and that "would have outweighed any potential marginal savings in costs to the parties and conservation of judicial resources."   JA 862 (Opinion at 24). This excuse sweeps aside Pierce's defenses and appellate rights while encouraging

---

[42] Claim preclusion has already been applied to the Commission.  *SEC v. Crofters, Inc.*, 351 F. Supp. 236, 257-58 (S.D. Ohio 1972) (granting summary judgment on the basis of res judicata barring SEC's second suit for an injunction), *rev'd on other grounds sub nom, SEC v. Coffey*, 493 F.2d 1304, 1309 (6th Cir. 1974) (stating SEC had not appealed the res judicata ruling).

the Division to usurp those rights by breaking the rules.[43]  The Opinion further

overlooks that only by breaking the rules did the Commission avoid delay in

collecting the $2.1 million disgorgement award.  Otherwise, delay would have

resulted from Pierce's appeal to the Commission and D.C. Circuit if the Division

had not abandoned the $7.5 million claim in favor of finality.[44]

---

[43] Because Pierce followed the rules and did not appeal the initial and final decisions in the First Proceeding, we will never know the effect that his affirmative defenses would have had on the outcome. For example, on December 6, 2007, well before the first OIP sought to disgorge profits from Pierce's resale of restricted shares held for 7 months, the Commission shortened the holding period from one year to six months. SEC Release No. 33-8869, effective February 15, 2008. Thus, in July 2008, in the First Proceeding against Pierce, the Commission proposed to disgorge profits (an equitable remedy) from restricted stock sales that would not have been premature at the time this equitable proceeding was commenced. The application of an obsolete 2004, one-year holding period to "remedial relief" sought in 2008-09—when the holding period had evolved to six months and Pierce's resales after seven months were being adjudicated—was at minimum questionable. Pierce sacrificed this and other defenses in favor of finality explicit within rules of the Commission, which he followed. Conversely, while the Commission refused to apply 2008 policy and law under Rule 144 to 2004 transactions, it insisted on applying a new 2007 Liechtenstein law with no retroactive application language to procure records of those same 2004 transactions supporting its $7.5 million claim. JA 845 (Opinion at 7); JA 516 (April 8, 2011 Buchholz Decl. at ¶ 8), and JA 262 (March 18, 2009 Buchholz Decl. at ¶¶ 5-8); JA 244 (March 21, 2011 Buchholz Decl. at ¶ 9), and JA 265-66 (Nesensohn letter dated March 25, 2009 re challenge by Pierce and others of FMA production of Hypo Bank records to SEC under Market Manipulation Act). In the interest of finality, Pierce also relinquished his right to challenge retroactive application of the Liechtenstein law and put the Commission on opposite sides of its own argument.

[44] In the event that the Division had truly wanted speedy resolution of the relief sought in the First Proceeding, the Division arguably could have refrained from adding the $7.5 million disgorgement claim and submitting the new evidence from Lichtenstein in the First Proceeding, obtained an order permitting claim splitting, and then immediately sought authority for a civil injunctive action in court with a TRO motion or a second OIP, in which the new claim and supporting evidence would have been presented for the first time—arguably avoiding res judicata while pressing on for relief available in the First Proceeding. *See* § 26(1)(a)-(f), entitled "Exceptions to the General Rule Concerning Splitting." But the Commission did

The Opinion disdains Pierce's side of the equation. There is no weighing of Pierce's defenses and appeal rights against the Commission's "need for speed." JA 861-62 (Opinion at 23-24). The proposed *ad hoc* exemption from res judicata would allow the Commission to dodge respondents' affirmative defenses simply by electing to commence an administrative proceeding rather than an injunction action in federal court, so that the Commission could maintain its control over due process and remain free to manipulate its rules.

The Commission has been charged with adjudicating matters as fairly as if it were a court. "[W]hen an administrative agency is acting in a judicial capacity . . . , the courts have not hesitated to apply *res judicata* to enforce repose." *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422 (1966). "Adjudication is a procedure by which a disinterested agency . . . is authorized to impose a binding resolution of a controversy over legal rights." Restatement (Second) of Judgments, Ch. 1, Introduction at 10.

The First Proceeding before the Commission was routine. It did not present a situation in which the agency was acting outside the scope of its delegated subject-matter jurisdiction or had restricted evidence before it. *Id.* As the Division understood, no formal subject matter barrier prevented the assertion of the $7.5 million claim in the First Proceeding, so the §26(1)(c) exception to claim splitting

not elect that remedy.

does not apply.  The First Proceeding's final decision did not "expressly reserve the . . . right . . . to maintain the second action," as in §26(1)(b).  *See* §26(1)(b) (stating an exception to the general rule concerning splitting where "the court in the first action has expressly reserved plaintiff's right to maintain the second action.")  In the absence of such a clear reservation (which would have signaled Pierce to preserve his defenses and appeal rights), the charges of unregistered sales through the Corporate Accounts raised in the First Proceeding were merged, extinguished, and barred from supporting a Second Proceeding, especially when the Division had contended the $7.5 million was within the scope of first OIP.

The law of res judicata endows the First Proceeding with finality, merging and barring the claims that were or could have been asserted.  The finality "reinforces the authoritativeness of the law itself. . . .  It compels repose." Restatement (Second) of Judgments, Ch. 1, Introduction at 11.  Whether the amount was $2.1 million, $7.5 million or $9.6 million, the final order of disgorgement compelled repose.

## E.    The Opinion also Erred by Failing to Rule in Pierce's Favor on Additional Affirmative Defenses.

### 1.    Equitable Estoppel Barred the Second Proceeding.

The Opinion misapplied the test for equitable estoppel against a government agency: "[a] party attempting to apply equitable estoppel against the government must show that (1) there was a definite representation to the party claiming

41

estoppel, (2) the party relied on its adversary's conduct in such a manner as to change his position for the worse, (3) the party's reliance was reasonable[,] and (4) the government engaged in affirmative misconduct."  JA 864 (Opinion at 26). Pierce satisfied these elements.

First, the Division represented to Pierce through its *actions*—not appealing the ALJ's disgorgement order or otherwise requesting an additional $7.5 million from the Commission—that it was satisfied with the certainty of a $2.1 million plus interest disgorgement order absent an appeal by Pierce.  Second, Pierce relied on the Division's actions to refrain from cross-appealing to preserve his defenses and appeal rights.  Pierce surrendered his right to challenge the disgorgement order in the event the Division sought to increase it.   Third, Pierce's reliance was reasonable.  He believed that the Division was obliged to ask the Commission to increase the disgorgement amount before a final decision was issued, since the $7.5 million claim had been asserted even before the Initial Decision was issued, and the Initial Decision used the related evidence to support liability and disgorgement of $2.1 million but deferred to the Commission as to whether the additional $7.5 million should be disgorged.

Pierce reasonably believed that by not appealing, the Division had expressed the same interest Pierce had in finality, and had reciprocally surrendered its right to seek an additional $7.5 million in order to avoid the risk that Pierce might succeed

42

on a cross-appeal and reduce the disgorgement amount to zero.  In effect, Pierce

believed that the Division would adhere to the Commission's rules, just as he had,

and would appeal to the Commission if the amount disgorged was not acceptable.[45]

Fourth, the government broke its own rules and ignored the consequences when it

filed a second administrative action seeking the very same relief that it had

relinquished, based on its own rule requirements and unequivocal actions in the

First Proceeding.[46]

The Opinion provides further that "it was reasonable for the Division to

interpret the First ID [Initial Decision] as suggesting that a separate action related

to the Corporate Accounts transactions was appropriate."  But that would only

have been a reasonable approach regarding a "separate action" against Newport

and Jenirob, who were not respondents and therefore not subject to the Division's

request to disgorge $9.6 million from Pierce in the First Action.[47]  It makes no

---

[45] The analysis in the Opinion at page 27 (JA 865) labels Pierce's concerns "speculative," but this presumes that Pierce could not rely on the Division and the Commission adhering to Commission rules and bedrock res judicata precepts.  In effect, the Commission argues that it was unreasonable for Pierce to assume that the Division and the Commission would not be lawbreakers.

[46] As if to avoid court scrutiny, the Commission chose a second administrative proceeding, within its control, over a civil injunctive action under the control of a federal court.  And yet, the Commission relied on collateral estoppel in the Second Proceeding well knowing through Pierce's Wells Submission that he would invoke claim preclusion.  These res judicata precepts are assuredly *not* issues in which the SEC has peculiar expertise.  They assuredly are matters for the courts.  The Commission's election to hide from a federal district court in the Second Proceeding underscores the plain evidence of its "affirmative misconduct."

[47] Although Newport and Jenirob were among the "associates" participating in the registration violations, they were not named as respondents in the First Proceeding.

sense as to Pierce. Otherwise, the Commission is presuming that the Division was reasonable in ignoring the ALJ's warning, the rules governing how the Division was to request the Commission for the additional $7.5 million and res judicata doctrine of merger and bar. No reasonable party would have ignored any of these three impediments, much less all of them.

Just as surely as the Commission had a right to rely on Pierce's inaction when it adopted the initial decision in the First Proceeding and later collected on the disgorgement award, so too Pierce had a right to detrimentally rely on the Division's inaction and the Commission's entering a final order that excluded the additional $7.5 million disgorgement proposed by the Division.

### 2. **Judicial Estoppel Barred the Fraudulent Concealment Claim.**

Judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Moses v. Howard Univ. Hosp*., 606 F.3d 789, 798 (D.C. Cir. 2010) (citing *New Hampshire v. Maine*, 532 U.S. 742 (2001)). The judicial estoppel doctrine prevents (estops) the Division from relying upon the fraudulent concealment exception to res judicata.[48] The rulings applying the fraudulent concealment exception to the res judicata doctrine rest on inconsistent positions.

---

So, the Commission was free to launch a second case against Newport and Jenirob—not including Pierce—without breaking rules or violating the res judicata bar.

JA 165-69 (Initial Decision at 16-20); JA 856-60 (Opinion at 18-22). Inconsistent positions are the heart of judicial estoppel.

There is a three-part test for judicial estoppel: (1) Is a party's later position clearly inconsistent with its earlier position? (2) Has the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled? (3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped? *Moses*, 606 F.3d at 798 (citing New *Hampshire v. Maine*, 532 U.S. at 742).

The *New Hampshire* court applied judicial estoppel to prevent a party from exploiting an inconsistent position. *New Hampshire v. Maine*, 532 U.S. at 755. That is the problem here. The Division successfully opened the record and submitted the "unconcealed" FMA (Liechtenstein) evidence supporting its "unconcealed" $7.5 million claim in the First Proceeding. Later, in the Second Proceeding, the Division took the inconsistent position that fraudulent concealment had prevented assertion of the $7.5 million (Corporate Accounts) claim in the First Proceeding. Yet, the Division had actually asserted the unconcealed claim in the First Proceeding, the ALJ denied the claim, and the ALJ signaled the Division to

---

[48] JA 753-56 (Pierce's Opening Brief to the Commission for Revision of Initial

ask the Commission to disgorge, or delegate to the ALJ the authority to disgorge, the additional $7.5 million.[49]   The Division, however, did not heed the ALJ's warning and now backtracks to assert the inconsistent claim that fraudulent concealment of material facts prevented the Division from the asserting the claim in the First Proceeding.  The inconsistency is that either the $7.5 million claim was asserted or it was not.   The claim was not fraudulently concealed.   It was asserted—end of analysis.[50]

Rather than address this inconsistency, the Opinion's analysis goes further off point: "the Division never took the position before the law judge in the First Proceeding that [$7.5 million of additional] disgorgement related to trading in the Corporate Accounts would be available *only* in that proceeding."  JA 867 (Opinion at 29).  That is a pointless observation and a wrong one as well.  The Division never took such a position because its assertion of the "Corporate Accounts" claim against Pierce in the First Proceeding *assured* that disgorgement *as to Pierce* "would be available *only* in that proceeding."

---

Decision at 20-23).

[49]  Apparently, the ALJ presumed that the Division would actually follow the Commission's rules and that the Commission would not indulge the Division's flouting Commission rules.

[50]  Just as New Hampshire asserted in one lawsuit that the "middle of the river" placed the Maine boundary in one location, it was judicially estopped from asserting a different location in a second suit.  *New Hampshire v. Maine*, 532 U.S. at 749, 755.

46

The analysis begs the question whether the Division or the Commission should have affirmatively reserved the claim for a Second Proceeding to avoid the merger and bar effect of the First Proceeding. Neither reserved it, and the Opinion fails to address the inconsistent position that fraudulent concealment was overcome by submitting the new claim and evidence in the First Proceeding and yet in the Second Proceeding, fraudulent concealment of the same claim was invoked to avoid res judicata.

### 3.    Waiver Barred the Second Proceeding.

The Opinion erroneously concludes that the Division did not waive a claim for additional disgorgement in the First Proceeding. JA 867-68 (Opinion at 29-30). The conclusion that the Division's failure to appeal the initial decision in the First Proceeding did not waive the claim for additional disgorgement rests on the assumption that the Division had the option of bringing a separate action against Pierce. JA 868 (Opinion at 30). That assumption is incorrect.

The Division abandoned the option of a separate action when it moved to admit the new evidence—effectively seeking to amend to conform to the evidence under Rule of Practice 200(d)(2)—and actually litigated the related claims in the First Proceeding. When parties have actually litigated claims, the res judicata bar expands to encompass those events and others that might have been litigated with them. *See Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.*, 750

F.2d 731, 739-40 (9th Cir. 1985) (en banc) ("If the . . . plaintiffs had <u>actually</u> <u>litigated</u> the liability of the District for segregative acts occurring after May 2, 1969, then the res judicata bar would have to expand to encompass those events and others that might have been litigated with them." ) (emphasis added).

The claims were actually litigated in the First Proceeding.  The Commission had subject-matter jurisdiction and the power to grant disgorgement relief against Pierce for the Corporate Account claims; therefore, a jurisdictional exception to res judicata could not apply.  Restatement (Second) of Judgments, § 26(1)(c) cmt. c. The parties did not agree that the Commission could split claims, and the Commission did not expressly reserve the claims (along with Pierce's related defenses) for a separate proceeding.  § 26(1)(a)-(b) (stating the party agreement and express reservation exceptions to the general rule against claim splitting) and express reservation exceptions to the general rule against claim splitting). Therefore, the Division and the Commission impliedly waived the $7.5 million claim against Pierce for the Corporate Accounts.

The affirmative defense of waiver bars a claim when "a party fails to raise an issue, despite a full and fair opportunity to do so."[51]  Waiver applies here, where

---

[51] *Matter of Armstrong*, 201 B.R.  526, 532 (Bankr.  D.  Neb.  1996) (granting summary judgment dismissal based on res judicata and waiver, where trustee could have raised objection in prior proceeding, but chose to not do so, thereby waiving his right to object); *In re Mathiason v. Halverson*, 16 F.3d 234, 238 (8th Cir. 1994) ("we hold that the bankruptcy court correctly concluded that [the] failure in the initial litigation to raise the joint tenancy issue, or to timely appeal the order implicitly resolving that issue, constituted a waiver").

the claim was actually raised.[52]     After the ALJ declined to increase the disgorgement amount, the Division and the Commission "chose to pursue a one-track strategy,"[53] allowing the $2.1 (with interest, $2.9) million disgorgement award to become final.   The election not to expressly reserve the $7.5 million Corporate Accounts claims before entry of the final decision or continue to seek disgorgement from Pierce for those accounts in the First Proceeding was a waiver, abandoning the claim in favor of the certainty and finality of a $2.1 million award.

## CONCLUSION

This is not a case in which a court would defer to agency expertise.   After the First Proceeding, there is no longer any arcane securities issue as to resale of S-8 stock option shares without further registration or compliance with holding period exemption requirements.   The issues now match the expertise of courts, not the agency.   Courts have traditionally developed and applied principles of res

---

[52] A motion to amend the OIP is allowed by the Commission Rules of Practice and such a motion may be made "at any time."   17 C.F.R. § 201.200(d).   Although such motions should be "freely granted," they are subject to the consideration that other parties "should not be surprised, nor their rights prejudiced."   60 Fed. Reg. 32738, 32757 (June 23, 1995) (citing *Carl L. Shipley*, 45 SEC 589, 595 (1974)); see also *Horning v. SEC*, 570 F.3d 337, 347 (D.C. Cir. 2009) (mid-hearing change in requested sanction held not a due process violation because no prejudice was shown).

[53] *Aboudaram v. De Groote*, *2006 U.S. Dist Lexis 2616*, 2006 WL 1194276 (D.D.C. May 4, 2006) ("The District Court's order refused to allow [plaintiff] to amend after [it] had rested its case at trial.   [Plaintiff] chose to pursue a one-track strategy and did not assert its Alternative Theories in a timely manner.   As a result, [plaintiff] is barred by *res judicata* from now using the Alternative Theories to recover the same debt").

judicata.  Those principles are not the focus of the SEC.  Nor does the SEC have any special expertise in equitable or judicial estoppel or waiver.  Courts do.

The Commission has lost its way in this case.  Simply by exercising its authority to commence an administrative enforcement proceeding rather than a civil injunctive action in court, the Commission contends it should be allowed to brush aside the fundamental precepts of res judicata, pretend to have relinquished appeal rights reciprocally with respondents such as Pierce, manipulate its own rules whimsically and then bushwhack respondents with revived claims—justifying such conduct by equating itself to an impoverished and debilitated social security applicant.  That cannot be allowed.  An agency that promulgates and polices rules must adhere to its rules, as surely as it must adhere to bedrock law.

The Commission's Opinion and Orders in the Second Proceeding, from which this appeal was taken, should be reversed and all relief against Pierce should be denied with prejudice.  Because the relief sought against him cannot be "substantially justified," Pierce should be awarded his attorney fees, pursuant to 5 U.S.C. § 504(a) (the Equal Access to Justice Act), 17 CFR § 201.31 and *In the Matter of Russo Securities, Inc.*, Exchange Act Release No. 42121 (Nov. 10, 1999).

DATED:  October 23, 2014

Respectfully submitted,

*/s/Christopher B.Wells*
Christopher B. Wells
David C. Spellman
LANE POWELL PC
*Attorneys for Petitioner*

*/s/Juan Marcel Marcelino*
Juan Marcel Marcelino
Madeleine M. Blake
NELSON MULLINS RILEY &
SCARBOROUGH, LLP
*Attorneys for Petitioner*

121503.0008/6190005.6

# ADDENDUM

## TABLE OF CONTENTS: STATUTES AND RULES

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ...................................... Add-2

Securities Act of 1933, 15 U.S.C. § 77e, Section 5 ......................................... Add-2

Securities Act of 1933, 15 U.S.C. § 77h-1, Section 8A(e) .............................. Add-4

Securities Exchange Act of 1934, 15 U.S.C. § 78u-3, Section 21C(e) ........... Add-4

## STATUTES AND RULES ADDENDUM

**Administrative Procedures Act, 5 U.S.C. § 706(2)(A), provides in relevant part:**

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> . . .
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**Securities Act of 1933, 15 U.S.C. § 77e, Section 5 provides:**

> (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
>
> > (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
>
> > (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
>
> (b) It shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this title, unless such prospectus meets the requirements of section 10; or

(2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 10.

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 8.

(d) LIMITATION.—Notwithstanding any other provision of this section, an emerging growth company or any person authorized to act on behalf of an emerging growth company may engage in oral or written communications with potential investors that are qualified institutional buyers or institutions that are accredited investors, as such terms are respectively defined in section 230.144A and section 230.501(a) of title 17, Code of Federal Regulations, or any successor thereto, to determine whether such investors might have an interest in a contemplated securities offering, either prior to or following the date of filing of a registration statement with respect to such securities with the Commission, subject to the requirement of subsection (b)(2).

(e) Notwithstanding the provisions of section 3 or 4, unless a registration statement meeting the requirements of section 10(a) is in effect as to a security-based swap, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, offer to buy or purchase or sell a security- based swap to any person who is not an eligible contract participant as defined in section 1a(18) of the Commodity Exchange Act (7 U.S.C. 1a(18)).

**Securities Act of 1933, 15 U.S.C. § 77h-1, Section 8A provides in relevant part:**

. . .

(e) Authority to enter order requiring accounting and disgorgement

In any cease-and-desist proceeding under subsection (a), of this section, the Commission may enter an order requiring accounting and disgorgement, including reasonable interest. The Commission is authorized to adopt rules, regulations, and orders concerning payments to investors, rates of interest, periods of accrual, and such other matters as it deems appropriate to implement this subsection.

. . .

**Securities Exchange Act of 1934, 15 U.S.C. § 78u-3, Section 21C provides in relevant part:**

. . .

(e) Authority to enter order requiring accounting and disgorgement

In any cease-and-desist proceeding under subsection (a) of this section, the Commission may enter an order requiring accounting and disgorgement, including reasonable interest. The Commission is authorized to adopt rules, regulations, and orders concerning payments to investors, rates of interest, periods of accrual, and such other matters as it deems appropriate to implement this subsection.

. . .

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  **X**    The brief contains __12,526__ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

_____    The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  **X**    The brief has been prepared in a proportionally spaced typeface using MS Word 2010 in a 14 point Times New Roman font or

_____    The brief has been prepared in a monospaced typeface using _____ in a ___ characters per inch _____ font.

Date:  October 23, 2014.          */s/ Christopher B. Wells*_____
                                  Christopher B. Wells

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

*Gordon Brent Pierce v. Securities and Exchange Commission, Case No. 14-1079*

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury that on the 23rd day of October, 2014, the BRIEF OF PETITIONER was presented to the Clerk of the Court for filing and uploading to the CM/ECF system. In accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court will send email notification of such filing.

I further certify under penalty of perjury, that a copy of the BRIEF OF PETITIONER and this Certificate of Service was served as follows:

**Attorneys for Respondent**
Benjamin Lawrence Schiffrin
Securities and Exchange Commission
100 "F" Street NE
Washington, D.C. 20549-9040
Email: schiffrinb@sec.gov

☐ by **CM/ECF**
☑ by **Electronic Mail**
☐ by **Facsimile Transmission**
☑ by **Federal Express**
☐ by **Legal Messenger**
☐ by **Overnight Delivery**

A copy has also been sent via Federal Express to the above counsel on this date.

Unless otherwise noted, 7 paper copies will be sent to the Court via Federal Express within 24 hours of filing with the CM/ECF System.

Date: October 23, 2014.          */s/ Christopher B. Wells*
                                 Christopher B. Wells